Go ahead, Counsel. Judge Freeland and the rest of the panel, I think, has raised a factual issue about whether or not the federal government is always informed when an alien is released. I can answer that, Your Honor, with one name. His name is Francisco Lopez Sanchez. He was arrested. He was taken into San Francisco local custody, and because San Francisco is a sanctuary city, one of dozens across the country, San Francisco refused to inform the federal government when he was released. Why is this a problem for the feds? Because I remember the feds litigated with Arizona when Arizona sought to adopt some policies on illegal aliens that were contrary to the policies that the feds preferred, and the feds won. They got a court decision that said these localities just can't make policy about how to deal with illegal aliens. It seems like it would be just as easy, unless it's a political choice not to, for the feds to challenge these so-called sanctuary cities. Your Honor, the problem with the legal theory that Your Honor presents is that it raises federalism issues. That's the same federalism issue, and it's been resolved. Right, but it's a federalism issue that falls in favor of the states because we would be imposing the duty of federal law enforcement. That's what you did to Arizona. It's a Prince problem? Yes, Your Honor. Commandeering? Yes, it would be commandeering. It would be requiring the San Francisco Sheriff's Department to inform, to act, as opposed to— Have you tried it? As far as I know, Your Honor, no, because of Prince. Your Honor, there is another name I know. To me it looks like just a policy problem, that the feds want to let the illegal aliens go and don't want to enforce federal law where it would run contrary to that policy. It's a practical matter as well, Your Honor. I think the panel has identified that when released does not mean unambiguously, immediately. There's an ambiguity in the statute in that respect. Therefore, we turn to Chevron Step 2, which says, is the BIA's interpretation reasonable? Let me stay with Chevron Step 1 for a moment and ask you that follow-up question that I wanted to for the last case. But, you know, we've got two pretty thoughtful opinions from the district judges in these cases with regard to plain language, and the government has some responses in the briefs and some of which you shared with us today. Why doesn't the canon of constitutional avoidance and that inquiry, which applies at Step 1, to say, well, you know, I think the government's interpretation is so broad, its discretion is so unfettered, that we're going to apply the canon of constitutional avoidance and go with the plaintiff's plain language interpretation? How does that work? Well, the canon of constitutional avoidance, Your Honor, ties into the larger prospect of the larger duty of the court to consider all of the repercussions that might flow from the choice between two reasonable interpretations. And what the court could do is one of two choices. One is to uphold the regulatory and statutory scheme and allow as-applied challenges for cases where the mandatory detention does not appear to satisfy the goal of preventing flight or reoffending. On the other hand, Your Honor, the panel could strike down on constitutional avoidance the policy. But to do that, Your Honor, would be inadvisable. It would contradict the congressional goal of taking into mandatory custody criminal aliens, the bad guys, Your Honor. What is the problem? You can have subsection A. So why is the consequences of the plaintiff's reading of the statute worse than the government's reading? Because under the government's reading, you have the ability at any point, whether it's 20, 25 years down the line, to show up and scoop a misdemeanor into custody and not give that person a bond hearing. So I think that gives rise to some pretty serious constitutional implications. Whereas under the plaintiff's reading, all the government gets is if it delays that long, then it gets subsection A's detention provision. That's government's choice. It can seek detention. It can argue dangerousness. It can argue flight. And then the person gets an individualized determination. What's so bad about that? The alternative that the petitioners here are advocating for would destroy, Your Honor, the Congress' intent in enacting 1226C. Of course there is a bond provision, but there is equally a 1226C mandatory detention provision. But you still have it for at least most of the people. I think you're not disagreeing that for most of the people, you pick them up immediately. So it's not like C is gone. I mean, you're saying strike down C. We wouldn't be striking down C. But it makes no sense, Your Honor, respectfully. Sure it does. What you're saying, you've got a statute where you say it's contrary to Congress' intent. I know the intent only from the words. The words say you're supposed to pick him up and hold him without bond when he's released from state custody. If that section doesn't apply, you're supposed to pick him up and either hold him without bond or grant him bond, depending on what the bond hearing comes up with. Either way, the government is not excused from its duty to hold and to apprehend and to hold these illegal criminal aliens. The only question is whether you pick them up when they are released, as the statute says, and there's no bond hearing, or whether you pick them up later, and there is. There's no burden on the government, and there's nothing contrary to congressional intent as manifestly, as the objective manifestation of intent in the words shows, in following that scheme. I just don't get what you're saying. What I'm saying, Your Honor, is that Congress knew that the immigration officials could not always immediately detain aliens upon their release from state custody. How do I know that Congress knew that? Their words suggest they knew the exact opposite, that they could. The Senate report, Senate report 10448, Your Honor, pages 16, pages 21, they're talking about concern about aliens who have been released. Yeah, but isn't that because this didn't exist yet? I mean, this changed that then. So how does, is there anything on those pages that says we know that if we say the federal government should pick these people up, that it won't be able to? Your Honor, that is an interpretation that satisfies the common sense idea that Congress did not want its mandatory detention scheme frustrated because ICE had a flat tire on the way to the jail. I don't really see much merit to looking at legislative history. It's just what some lobbyists got some staffers to put in these various reports without anyone getting to vote on it or veto it or sign it or anything else. But if I do pay attention to it, in this case, it looks like what it says is Congress is concerned about illegal criminal aliens being out on the street, and they're telling your department, quit fooling around with this. Grab them immediately when they get out of jail, and it doesn't matter if they're on parole or what they're on. Grab them immediately when they are released, and put them in custody and hold them there. We know from Damore, Your Honor, that the purpose of 1226C was to prevent criminal aliens from absconding during their removal proceedings, and that goal is satisfied, and that goal can be only met for criminal aliens with mandatory detention. Isn't it not to prevent people from, I mean, that's the secondary thing. The primary thing is start the removal proceedings right away. Don't wait 10 years. I mean, isn't that the real primary purpose? That is a goal, Your Honor, and it's a goal that the government strives to do. But it is a goal that the BIA realized is not always possible. It's a goal that's not possible for Mr. Lopez Sanchez in San Francisco. And in those cases, it would frustrate Congress' goal of preventing flight during removal proceedings. Well, no, you just pick them up under A. You just pick them up under A and hold them. It would frustrate Congress' goal in removing discretion. Why do you need discretion? A guy like that, you think some judge, after all his crimes, is going to let him out? Because, Your Honor, Congress found that when these folks got bond hearings under A or under the regime before A and C were bifurcated, that too many of them were fleeing. A was unworkable for criminal aliens. But they can only flee if they get bond. Why? What's the problem there? What you're really saying is that the bond hearings are too lenient or something? Bond hearings contain too much discretion, Your Honor. On the judge's part? Yes, Your Honor. Judges cannot tell the future. So what this really is about is transferring power from judges to the executive department of the government for people who are out of jail, not in jail, and have been living in the community for some time. This case is about respecting Congress' intent and effectuating that plan through the enactment of 1226. So your interpretation essentially is that, look, Congress looked at the problems and Congress believed that too many people were being let out on bond and didn't trust the IJs and the BIAs to handle them appropriately under an individualized determination. So Congress decided to enact this mandatory statute to say, well, for individuals falling within this category, we're going to go ahead and transfer the power over to ICE, and the AG can pick them up whenever the AG feels like it, contingent on resources. It's imposing a duty on DHS and removing discretion either from the BIA, either from the immigration judges, and removing discretion from DHS to release those individuals. But there's a contradiction in your argument in that you are saying that this is a mandatory statute where the AG shall take these individuals into custody, but yet there's no time limit on the other side. The AG can decide whenever it wants to exercise that mandatory directive, right? It's the government's policy, Your Honor, that when an alien who falls within 1226C1 is encountered, that removal proceedings begin against him. Well, I don't know what that means it's encountered because you can go out and get them. You can go look for them. We can go look for them, Your Honor. It doesn't say that at all. It's not an accidental encountering on the street, like, oh, we happened to run into you. The words are the opposite. They're the exact opposite. There are words here that take away discretion. The words are shall and when the alien is released. The part that takes away discretion is the Attorney General shall take into custody any alien who has done these various things when the alien is released. That's the denial of discretion. And you're saying, no, no, no, no, we have discretion about when we catch the alien. The part where there's no discretion is whether to hold him without a bond hearing. I'm not saying that at all, Your Honor. I'm saying that when DHS encounters a criminal alien, either because it was rearrested when we didn't know about his release the first time or because of a traffic stop, he must go into removal proceedings, and he must be subject to the concomitant mandatory detention under 1220. But these class members, aren't there a lot more individuals that DHS knows about but just isn't willing to expend the resources to find? That it lacks the resources to find, Your Honor. Right. So in the earlier case, the counsel was saying, some of these class members were not arrested again, were not encountered in a traffic stop. They were at their home, and all of a sudden DHS shows up because of changed priorities. That means DHS knew about those people all along and just didn't go look for them. So it was a totally discretionary decision at some point to go look for them. Do you deny that that's the factual setting here for some of these people? What I'm saying, Your Honor, is that when the resources permitted DHS, one individual or a handful of officers, each of whom has hundreds of new cases added to his docket each year, when resources permitted that team to go apprehend that individual, they did so. But you don't deny that you knew where that person was, could have done it a week earlier if you had the resources because you knew where the person was. We didn't know where he was until he was in handcuffs, Your Honor. Well, you thought you did. You found him. I mean, you did, in fact. I mean, you didn't know for sure that it was true, but it worked. You found him when you wanted to. We had information on where he might be located. That sounds more like the old J. Edgar Hoover approach to stolen cars. When the local FBI agents' numbers are too low and they're at risk of losing some personnel slots, they call up the state troopers and do some stolen cars for them, pick up some car thieves. It looks like when you need your numbers here, you go pick up some of these deportable aliens that you've known about all along. This is not about bad faith, Your Honor, by DHS. The petitioners aren't accusing the government of bad faith. This is about triage. This is about resources. This is about not finding out when immigrants are released who are criminal aliens. But, okay, it has to do with enforcement priorities, right? You have some resources you have to prioritize. Fine. But in that discretionary decision about who you pick up immediately and who you wait 10 years, you've already made a decision at some point. Now, maybe you'll change your mind about the priorities later, but at some point DHS made a decision that the people who are out there for 10 years, despite the DHS knowing where they are, are not that dangerous, right? It must have been what you thought. They are not perhaps as dangerous as the ones who were detained preceding them. But they are not necessarily not dangerous, Your Honor. Right, but we may not know, and there was some decision that they were less dangerous. So if we assume that, then why doesn't that mean those are exactly the people who should have bond hearings under A? Especially after they've been out for 10 years without committing any crimes, because if they had, you would have found them earlier. Flight is also a risk, Your Honor, that 1226C was intended to preclude. These aliens, when— So is A. That's why you can detain them unless they're a flight risk. And we know from Damore— Or if they are a flight risk. We know from Damore and we know from the congressional history that the bond hearings simply did not suffice to satisfy Congress's interest. Your Honor, I'd like to close. If you lose on the question of whether you have to take them into custody when the alien is released, but we— So we conclude that there's time sensitivity there and that Congress meant for there to be a restricted period of time. Do you want to suggest what that time period should be if we read some kind of a reasonableness requirement to account for the flat tire, to account for sanctuary CD, some of these fairly isolated, it seems to me, instances that you're talking about where the government is doing what it can, but still for various reasons doesn't find out exactly when the alien is released, but yet you want them to fall under this mandatory detention provision? Your Honor, we have no alternative to our position that the statute is ambiguous when is not time limiting and is duty triggering. Even the petitioners are not advocating for a reasonableness standard. They're claiming that the statute clearly and unambiguously means immediately. But we might agree with them and still have to define immediately. If you don't agree with them, Your Honor, then you've conceded to the government on Chevron Step 1, and at that point— No, no, we do. Say we do agree with them on Chevron Step 1. The government has to pick up these people immediately to trigger this statute, but that still doesn't answer what immediately means. I mean, an example of taking out the trash when you get home, that might be in an hour, five minutes. I mean, it might not be one second. I'm not going to come up with a remedy, Your Honor, but I would like to point out that if you're quibbling on what immediately means, essentially what you're quibbling with is the meaning of when, and does when mean immediately? It may, it may not, therefore it's ambiguous, Your Honor. I'd like to close— When means subsequent to. That's the government definition of when, subsequent to. It is, it is— You haven't found a dictionary that defines when as subsequent to. No, but— Or any other source. At any time after, Your Honor. Just making it up. No, Your Honor. Is that right? No, Your Honor. We've cited dictionaries that cite when as meaning at points after, subsequent to. So taking out the trash, you can wait until the next trash day. It doesn't really matter. The context of taking out the trash, Your Honor, is different from the context of satisfying Congress' goal of preventing flight and absconding once removal proceedings begin. I think Congress was more concerned about crime on the streets from these criminal aliens. Those, the aliens in that class, that subsection C class, they're criminal aliens. They're not just nice people trying to make a better living. They're criminals. That's, it says so right in the title. And then in the subsections, it limits the criminal aliens to bad criminals. These aren't just drunk drivers or something. Correct, Your Honor. And that duty is not limited. That duty of picking up those bad criminals is not limited to cases where the individual walks out of the jailhouse. The duty of preventing those bad guys from committing new crimes and from absconding from their removal proceedings. Before they begin. Which is why the gap, Your Honors, doesn't matter. Do you want to save the rest of your time? Yes, Your Honor. May it please the Court. My name is Teresa Nguyen. I'm here on behalf of the PREA plaintiffs appellees. As Your Honors have noted, Section 1226 is non-ambiguous. It commands the government to detain criminal aliens immediately upon release. Now, the government seeks to convert this mandate into boundless discretion. Could you help a little bit on the word when? Actually, the statute doesn't say immediately. It says when. It does say when, yes, Your Honor. And the First Circuit case has an extensive discussion of what when means. Could you talk about what when means in the context of slight delays, such as the flat tire hypothetical or delay in getting the notice. Somebody was trying to call somebody to go get the criminal coming out of jail, and the person to receive the call was on the phone with his girlfriend or her boyfriend, and by the time they got the call, they didn't have enough time to drive there, and they got there late. There are all these possibilities of not getting people at the gate, even when the government is trying to get them at the gate. What does when mean? Here it's clear that Congress intended a seamless transfer in custody. They didn't want this group of criminal aliens to be released into the community where they might reoffend or they might abscond. So they wanted this continuous chain of custody from criminal custody into immigration custody. So that implies that when doesn't mean immediately. They get an individualized bond hearing if the government car isn't at the prison gate, but they know who the person's girlfriend is, and they assume he would have spent the night there and go pick them up there at 5 the next morning. Does that person get denied bond under subsection C or get a bond hearing under subsection A? Congress drew the line at when, and when means immediately. Does that literally mean handcuffs to handcuffs? Does it even mean you can't be sitting outside the gate? Because there's 10 seconds of walking out of the gate. No, I think that would still constitute a seamless transfer, Your Honor, where they're waiting there at the gate, and there's an intended transfer from the criminal custody into immigration custody. So what's the difference between waiting at the gate then and being a block away, and they're driving down that block and they see the person? The person's walked from the gate to half the block. Now all of a sudden it's A instead of C. It seems to me like, well, let me let you answer that. I understand that there seem to be line-drawing issues here. We really think that Congress did intend for a pure seamless transfer because that's the line that's drawn. Congress could have used the word upon or immediately upon release or something like that. That language would have definitively supported your view that it's an immediate, seamless transfer from custody to custody, but it chose the word when. So what's wrong with saying when means immediately but not in the sense of a seamless transfer? What's wrong with that interpretation? We do think that Congress meant a seamless transfer. That's apparent from the history that they didn't want people released into the community at all. But it doesn't account for a situation where but for some slight quirk of fact, like a flat tire, that person didn't get transferred immediately from custody to custody. If you think there is some leeway in the term immediately or in the seamlessness of the transfer, I think we would agree with counsels who spoke earlier, Mr. Adams, that if the government had intended and made some attempt to show up at the jailhouse door, they knew about the time they were being released because they were notified through the databases that they received the notifications from, that this person is going to be there, they make an attempt to be there, and through some situation, some fortuity, there's a flat tire, for example, they aren't able to show up, then I think there would be allowed some leeway there. Well, what if the government made an attempt but couldn't find the individual that day, and there's only two agents in the office because it's a smaller field office, and the agents every day does something, look in the computer, do some drive-bys, but it takes them three weeks to finally apprehend the individual. Is that kind of leeway contemplated? We don't think that's the kind of leeway that's contemplated. Well, why not? They're making good faith efforts, just like the agent who tried to show up at the door but got a flat tire on the way. There is, because the gap that occurs for the individual detainee, for the individual non-citizen, it matters. It makes a difference because there are changed circumstances from the time of release from criminal custody when we have very little information about that individual, and perhaps we can make a categorical assumption there. But when there is some time that has passed, when weeks have passed, when months of years have passed, the person can be a different person now. Yeah, I think so. When years have passed, certainly, and we raised that with counsel as well, I think the risk of flight and dangerousness even is mitigated with changed circumstances. But what changes three days later, a week later? There has to be some line that is drawn, Your Honor. We think that the line there was immediately because of the word when, because it was a directive that the government shall detain when released. So the line is the same day? I would think that at least it should be the same day. Why shouldn't we just go with the First Circuit? The First Circuit went through this with great care, rejected the government's argument quite firmly, and then analyzed the argument that you're making for when meeting immediately and concluded after just the sort of things we've been discussing and including the problem of requiring foreknowledge of the impending release for which the government must depend on the cooperation of state and local authorities. After considering all that, the First Circuit said, based on the textual context, they interpret 1226C as requiring that the criminal be detained within a reasonable time after the release and that what is a reasonable time must account for the inherent difficulties in identifying and locating the alien upon release from state custody. The statute does not tolerate unreasonable delays, but neither does it require immediacy. Why, if you prevail, shouldn't we just say we agree with the First Circuit, have an indented quote with this language? And that's all she wrote. Because the plain language of the statute, Your Honor, doesn't allow for any discretion there. It doesn't allow for that reasonable misdetermination or kind of the— It didn't say anything about discretion. It said—it spoke about contingencies that would not be discretionary or under the government's control, like, for example, San Francisco not telling the feds about some criminal that they're about to set loose on the streets. As I mentioned earlier, this isn't—the purpose of the statute is not punitive. It's administrative. And so the gap in time matters to the assessing the individual's bond risk or whether or not they're dangerous. And so if they receive that bond hearing, an IJ can then determine, based on that record, whatever happened in that gap between criminal and immigration custody, whether or not they are in fact a danger to the public or a flight risk. Your Honor, I also want— So you're saying when does mean immediately, reject the First Circuit interpretation, require immediacy, and have an individualized bond hearing if it isn't a handcuffs-to-handcuffs turnover? That's the position we hold, Your Honor. And it's also because we represent a class of plaintiffs that cover people who are released one day after as well as people into the future. Now why should we do that? It's kind of nice to have the security of agreeing with a sister circuit, especially when its opinion looks pretty reasonable. Why should we go your way instead of the First Circuit's way? I think it's a plain—it comes back to the plain language of the statute, Your Honor, and I think that our interpretation holds more— Why is it so plain? You know my garbage hypo. I interpret when to mean pretty soon after I get home, but not before I take off my suit. What am I missing there about how to understand the word when? That's fair, Your Honor, but I think there are also circumstances, and we have to take it in the context of the statute. The context of the statute here was Congress's concern about people being released and immediately reoffending being very dangerous. You can have other hypotheticals where when is used, and in that context when really does mean immediately. It's not dangerous that my garbage is out there for another 10 minutes, but it is dangerous to have some criminal on the streets loose with nobody watching them for another 10 minutes. That's exactly right, Your Honor, and I think that's what Congress's intent was here as reflected by the language that they used, by the mandate and by the when released. If they do catch them 10 minutes later, just hold a bond hearing, and it's a foreordained result. Right, and the bond hearing is just the most minimal of process that we're affording here. As Mr. Adams noted earlier, it's the detainee's burden of proof to show that they're not a flight risk or a danger, and in no other context does that occur. Also, these hearings are unreviewable. I also wanted to address, Your Honor, the issue of constitutional avoidance that was raised earlier, and the government raised the issue of as-applied challenges, but that's simply not how constitutional avoidance works. The government conceded that the statute could be unconstitutional as applied to someone out 20 years into the future, or like some of our name plaintiffs, perhaps 5, 7, 11 years out of custody. To justify mandatory detention, there has to be a reasonable relationship to the purpose of public safety and preventing flight. There's a complete disconnect here. It's not reasonable to presume that these individuals constitute these types of risks. As the Supreme Court made clear in Clark v. Martinez, constitutional avoidance has to be considered in all of the applications. If there's a constitutional issue, if it raises a due process challenge, if it raises a due process question as applied... Why there's a constitutional avoidance problem. As I remember, the constitutional decision from the Supreme Court is you can't keep them in jail forever. At some point, there has to be an opportunity for an individualized consideration of when or if they should be let out. That's not the same question that's raised here. So what is the basis for constitutional avoidance concern? Prolonged detention is not your right, Your Honor. That's not the question here. But it's that relationship, it's that reasonable relationship between mandatory detention, which is that issue here, and the congressional purpose of preventing flight risk and danger. And for individuals who have been out in the community, have not reoffended, they've been out for 20 years, like our named plaintiff, Mr. Padilla, has been out for 11 years without reoffending. There's no connection there. There's no connection at all. And so that's the due process challenge, that's the due process issue. And you don't even have to, for avoidance, you don't even have to prove necessarily that you would win that. You just have to prove that it's a hard constitutional question that we should avoid, right? Right. That's absolutely right, Your Honor. Why is it a hard constitutional question? If we want to go with the constitutional avoidance argument, what case should we rely on to say there's a constitutional problem that we would be closely approaching? We would rely on Zedvitas, the Zedvitas case, which really points to the fact that even non-citizens... Which one was that? Zedvitas v. Davis. Was that the prolonged detention one? No, Your Honor. In this case, in Zedvitas, the court made clear that non-citizens, even non-citizens are entitled to due process protections under the law. Here, that's what we have. We have a severe deprivation of liberty. That's so broad. It just sort of begs the question of what's a due process violation. Certainly, but it's certainly a due process violation. It kind of combines with every time you say flight. I'm thinking that's what Congress wants. It wants them to fly to the country they are allowed to be in out of our country, which they're not allowed to be in. Just getting back to the due process concern, Your Honor, the risk, the deprivation of liberty, of course, is one of the most fundamental rights that we have. Here, they're deprived of liberty without any process at all. They're put in detention. They don't have any opportunity for a hearing, and all we're asking for here is just a simple bond hearing. All right. Thank you very much. Thank you. Opposing counsel just mentioned Cidvitas, and that's 533 U.S. 678. That was a case involving prolonged detention, so the central holding is not applicable here. I thought that, and I could be completely wrong in my recollection, and please correct me if I'm wrong, that the government had conceded in that first circuit case that went en banc during the en banc proceedings that there would be constitutional concerns if you were to go out 20 years later and scoop somebody up, but that that could be handled by way of an as-applied challenge. Was there not a concession there? I don't recall, Your Honor. It was not the hearing, but what we would say now is that we're not conceding that. If an alien does raise concerns based either on the gap or the gap in conjunction with other factors, that there is an as-applied challenge. I would think that if DHS conceded that in that case, then it would have to concede it here. I don't believe it conceded that, Your Honor, and if it did, we retract that. There is, as I was saying in Cidvitas, a finding that an alien's risk of flight goes up with his likelihood of removal, and that's what we have here with criminal aliens. Do you have a case that addresses this idea that you can get out of an avoidance problem with the possibility of as-applied challenges? We have Clark v. Martinez, Your Honor, which says that the court must take into account all of the possible repercussions of its choice between two alternatives. That sounds like your answer is no. Do you have any case that says we don't have to worry about constitutional avoidance because anyone who might have this constitutional issue could bring an as-applied challenge? No, Your Honor. What we're standing on is this choice before the court to adopt the holding of the other three circuits that have faced this issue, and in the First Circuit decision, Castaneda has been withdrawn. Incidentally, I am not fully up to date on the First Circuit decision, Castaneda. Is the en banc proceeding over? No, Your Honor. We're waiting for a decision. When you say the decision's withdrawn, you just mean that it's been taken en banc. You don't mean that it's been overturned. The panel decision was vacated, Your Honor. Well, of course. When you take a case en banc, you vacate the decision, but it may be reinstated, or an en banc decision may say the same thing in different words. There's no en banc decision, Your Honor. The en banc is still pending? Correct, Your Honor. Your Honor, Congress wrote 1226C to end stories like the petitioner in this case. Not Mr. Padilla, who the petitioner's counsel named, but Alvin Rodriguez Moyo. He is the class representative. He was released, even though he committed the crime listed in 1226C1. He was a bad guy, Your Honor, and he proved that by being arrested for first-degree murder earlier this year. He's now facing trial next month. Congress thought... Why was he out? Sorry, Your Honor? Why was he out? Why didn't he go from handcuffs to handcuffs? We don't... Well, that was the case, Your Honor. It's complicated. It'll take me about 30 seconds to explain. With your indulgence, I can. I'm out of time. Go ahead. There was a policy, Your Honor, in the field office at some point where they yielded to district court decisions about the gap in custody, even though those district court decisions contradicted what should have governed ICE's policy at the time because what should have governed is Madam Rojas. And so, as a result, he was allowed to go free because of his gap in custody. Wait, but why was there a gap? Isn't that the question? Why wasn't he picked up immediately? There was a gap because, Your Honor, he was released because DHS at the time was following district court decisions that said if there is a gap, you must release him. Yeah, but why was there a gap? Oh, I don't know, Your Honor. I'm sorry. I don't have that before me. Sounds like you're trying to blame the district court, but you haven't explained why there's a gap. I understand your question, Your Honor, and I don't know the answer. But the point is that regardless of why there was a gap, Congress recognized him as a bad guy, and Congress... I don't know why he didn't go handcuffs to handcuffs. No, Your Honor, and I'm conceding I don't know. But Congress recognized that there may be cases where DHS cannot or does not take individuals into mandatory detention immediately upon their release from criminal custody. But it makes no sense that we exempt those aliens from mandatory detention simply because of that. And finally, Your Honor, even if we missed a deadline, even if there is a deadline and we missed it, we stand on the line of cases culminating in Montalvo, Murillo. We have a duty to take the bad guys off the street, Your Honor. And if we fail to meet that duty, that duty is not excused. And we still have to do it. Better late than never cases that you've briefed. Yes, Your Honor. All right. Well, thank you very much, both sides, for your helpful arguments. The matter is submitted for decision. We'll take a 10-minute break before calling the next case.
judges: Kleinfeld, Nguyen, Friedland